O

# United States District Court
# Central District of California

| | |
|---|---|
| UNITED AERONAUTICAL CORPORATION et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES AIR FORCE et al., <br><br> Defendants. | Case № 2:20-CV-01985-ODW (JDEx) <br><br> **ORDER GRANTING MOTION TO DISMISS [13]** |

## I.  INTRODUCTION

This action arises from a dispute involving proprietary intellectual property between Plaintiffs United Aeronautical Corporation ("UAC") and Blue Aerospace, LLC ("Blue Aero") (collectively "Plaintiffs") and Defendants United States Air Force and United States Air National Guard ("ANG") (collectively "Defendants"). Defendants move to dismiss for lack of subject matter jurisdiction. (Mot. to Dismiss ("Motion" or "Mot."), ECF No. 13.) The matter is fully briefed. (*See* Opp'n to Mot. ("Opp'n"), ECF No. 16; Reply ISO Mot. ("Reply"), ECF No. 17.) For the reasons below, the Court **GRANTS** the Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

The Mobile Airborne Fire Fighting System ("MAFFS") is a roll-on, roll-off mobile fire-retardant tank system designed for use in aerial firefighting. (Compl. ¶ 24, ECF No. 1.) In April 2000, manufacturer Aero Union entered into a contract (the "2000 Contract") with the United States Forest Service for the purpose of "designing, developing, fabricating, and verifying a new prototype" MAFFS II and manufacturing eight new MAFFS systems. (*Id.* ¶ 27.) The eight MAFFS II units are currently deployed in a joint program between the Forest Service, Air Force Reserve, and Air Force/ANG. (*Id.* ¶ 26.) The Forest Service is responsible for the maintenance, storage, and operation of the MAFFS II units, while the Air Force Reserve and ANG provide the aircraft, flight crews, maintenance, and support personnel to fly the missions. (*Id.*) Pursuant to the 2000 Contract, Aero Union owned the MAFFS II data rights, patents, and other intellectual property developed under the program, subject to the Forest Service's use rights derived from the 2000 Contract. (*Id.* ¶¶ 27, 30.) Over the years, Aero Union and the Forest Service executed numerous modifications to the 2000 Contract, the last of which required Aero Union to deliver a data package to the Forest Service for spare parts procurement, maintenance, and operations purposes. (*Id.* ¶ 28.)

Aero Union ceased business operations in 2012, and, through a foreclosure sale in 2013, UAC obtained certain of Aero Union's assets and property. (*Id.* ¶ 29; *id.* Ex. 1 ("Data Rights Agreement" or "DRA") at 1, ECF No. 1-1.) As relevant here, UAC obtained title to the intellectual property related to the MAFFS systems, "including inventions; patents and patent applications; trademarks; data rights; and all other relevant IP relating to the systems." (*Id.* ¶ 29.) Presently, UAC and Blue Aero are in a joint venture to develop, market, and sell the MAFFS systems. (*Id.* ¶ 14.)

In June 2014, pursuant to the final contract modification requiring delivery of a data package, UAC and the Forest Service executed a Data Rights Agreement for delivery of a hard drive containing a copy of the MAFFS II system proprietary data to

the Forest Service. (*Id.* ¶ 31.) Under the agreement, UAC and the Forest Service each acknowledged and agreed that:

> [A]s set forth in [the 2000 Contract], the technical data produced or specifically used or related to the [MAFFS II] developed pursuant to such contract shall remain the property of UAC (as the purchaser of assets of Aero [Union] from its secured creditor, including the System) and [the Forest Service] shall have unlimited rights to view and use the data required for the continued operation and maintenance of the [MAFFS II] product.

(DRA 2.) Plaintiffs contend this agreement granted the Forest Service only limited use rights. (Compl. ¶¶ 30–31.) Plaintiffs allege the Forest Service conveyed the hard drive to ANG and that ANG also had full knowledge of the limited rights. (*Id.* ¶ 33.)

From January 2014, ANG has funded, and is currently funding, a program to upgrade and replace the MAFFS II systems with a derivative product called "iMAFFS." (*Id.* ¶ 32.) This program is managed by Redstone Defense Systems. (*Id.*) In or about July or August 2014, ANG turned the MAFFS II proprietary data over to Redstone Defense Systems to develop the iMAFFS. (*Id.* ¶ 33.) Beginning in November 2014, Plaintiffs levied a series of increasingly formal objections to ANG's use of the MAFFS II proprietary data. (*Id.* ¶¶ 35–37.) ANG rejected those objections and determined that the United States government either co-owned the data rights with Plaintiffs or had broad "government purpose" rights to use the data. (*Id.* ¶ 38.) Plaintiffs alternatively sought to be involved in developing the upgraded system but were ultimately unsuccessful. (*Id.* ¶ 34.)

In 2018, Plaintiffs confirmed that divisions of the Air Force were marketing the iMAFFS system to the international market. (*Id.* ¶ 41.) Plaintiffs contend that the iMAFFS system is derived from the MAFFS II, and therefore marketing and promotion of the iMAFFS will cause unlawful disclosure of Plaintiffs' MAFFS II proprietary data. (*Id.* ¶ 41.)

On February 20, 2019, Plaintiffs submitted claims of unlawful action in violation of Air Force regulations and procurement law to the responsible Air Force

divisions. (*Id.* ¶ 44.) The Air Force agreed to cease certain activities surrounding the marketing of iMAFFS but maintained its intention to develop Foreign Military Sales ("FMS") procurements for the iMAFFS, which Plaintiffs contend will ultimately cause disclosure of MAFFS II proprietary data to the international market. (*Id.* ¶ 45.) On September 17, 2019, the Air Force issued its final decision on Plaintiffs' claims, finding that the United States government owned the MAFFS II proprietary data, had unlimited use rights in the data, including the rights to use the data to develop the iMAFFS system for sale to the international market, and the Air Force approved the iMAFFS for future marketing and sale under its FMS program. (*Id.* ¶ 52.)

Accordingly, in February 2020, Plaintiffs filed this action against Defendants asserting violations of the Administrative Procedure Act ("APA") and seeking declaratory and injunctive relief. (*See generally* Compl.) Plaintiffs contend that Defendants' use and disclosure of the MAFFS II proprietary data constitutes unlawful agency action in violation of the Trade Secrets Act and federal procurement law. (*See id.* ¶¶ 6, 56–57.) Plaintiffs seek a determination that Defendants have no ownership rights in, and may not use or disclose, the MAFFS II proprietary data to develop or market the iMAFFS. (*Id.* ¶¶ 65–66.)

Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction and failure to state a claim.[2] (Mot. 4.)

### III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), a party may move to dismiss a case for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "They possess only that power authorized by Constitution or a statute, which is not to be expanded by judicial decree." *Id.* (internal citations omitted). "It is to be presumed that a cause lies outside

---

[2] As the Court finds the jurisdictional question dispositive, it does not reach Defendants' arguments that Plaintiffs fail to state a claim.

this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted). Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of demonstrating that the court has jurisdiction. *Id.*; *see also Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). "A plaintiff suing in a federal court must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction, and, if he does not do so, the court . . . must dismiss the case . . . ." *Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) (per curiam), *abrogated on other grounds by Hertz Corp. v. Friend,* 559 U.S. 77 (2010) (quoting *Smith v. McCullough*, 270 U.S. 456, 459 (1926)).

Where the United States is a defendant, a mere showing of federal jurisdiction does not suffice. This is because "the United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (internal quotation marks omitted); *Gabriel v. Gen. Servs. Admin.*, 547 F. App'x 829, 830 (9th Cir. 2013) ("The United States is immune from suit unless it has expressly waived its sovereign immunity by consenting to be sued; the existence of such consent is a prerequisite for jurisdiction." (internal quotation marks omitted)). Absent a waiver of sovereign immunity, courts have no subject matter jurisdiction over cases against the government. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The party suing the United States bears the burden to identify an unequivocal waiver of immunity. *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir. 1983).

## IV.    DISCUSSION

Defendants move to dismiss for lack of subject matter jurisdiction on the ground that Plaintiffs' claims arise from a government contract over which the Contract Disputes Act ("CDA") vests exclusive jurisdiction in the United States Court

of Federal Claims. (Mot. 4.) Plaintiffs respond that their claims are not contract disputes subject to the CDA, but instead concern Defendants' decision to unlawfully disclose Plaintiffs' MAFFS II proprietary data. (Opp'n 5, 9–16.) Plaintiffs contend their claims are cognizable under the APA and, accordingly, the APA and 28 U.S.C. § 1331 together provide this Court with subject matter jurisdiction. (*Id.* at 7–9.)

### A. Subject Matter Jurisdiction & Sovereign Immunity

Plaintiffs contend the general jurisdiction statute, 28 U.S.C. § 1331, provides subject matter jurisdiction here. (Opp'n 7; Compl. ¶ 9.) That section provides original jurisdiction to district courts over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. However, section 1331 does not waive sovereign immunity. *See Holloman*, 708 F.2d at 1401; *see Chatman v. United States*, No. CV 14-1244-PA (MANx), 2014 WL 6367110, at *3 (C.D. Cal. Oct. 22, 2014), *aff'd*, 671 F. App'x 427 (9th Cir. 2016) ("An assertion that a general jurisdictional statute applies does not suffice to confer jurisdiction when the government did not waive its immunity.").

For a waiver of sovereign immunity, Plaintiffs invoke the APA, 5 U.S.C. §§ 701–06, which provides a limited waiver of sovereign immunity for claims seeking review of agency action. (Opp'n 7; Compl. ¶¶ 7, 9, 23); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18 (1979) (recognizing that an agency's decision to disclose a proprietor's trade secret information is "reviewable agency action" within the meaning of the APA). Specifically, the APA waives the sovereign immunity of the United States only if (1) the plaintiff's "claims are not for money damages, (2) an adequate remedy for its claims is not available elsewhere[,] and (3) its claims do not seek relief expressly or impliedly forbidden by another statute." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998); *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1122 (Fed. Cir. 2007) (citing 5 U.S.C. §§ 702, 704).

Pertinent here, the Tucker Act, 28 U.S.C. §§ 1346 and 1491, also includes a limited waiver of sovereign immunity. *See Suburban*, 480 F.3d at 1121. This Act grants the United States Court of Federal Claims "jurisdiction over any claim against the United States founded . . . upon any express or implied contract with the United States." *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1484 (9th Cir. 1985) (quoting 28 U.S.C. § 1491(a)(1)). It expressly divests district courts of jurisdiction over "any civil action or claim against the United States founded upon any express or implied contract with the United States . . . which [is] subject to sections 7104(b)(1) and 7107(a)(1) of" the CDA. 28 U.S.C. § 1346(a)(2); *see also Mendenhall v. Kusicko*, 857 F.2d 1378, 1379 (9th Cir. 1988) (noting that jurisdiction resided with the Court of Federal Claims where plaintiff's claim was founded on an express contract with the United States, subject to the CDA).

Significantly for our purposes, the Tucker Act limits "the remedies available in actions on government contracts" to money damages. *N. Side Lumber*, 753 F.2d at 1485. In light of this limitation, the Ninth Circuit has repeatedly held that "[t]he Tucker Act . . . impliedly forbids declaratory and injunctive relief and precludes the APA § 702 waiver of sovereign immunity for any claim founded upon an express or implied contract with the United States." *Cooper v. Haase*, 750 F. App'x 600, 601 (9th Cir. 2019) (brackets and internal quotation marks omitted); *Gabriel*, 547 F. App'x at 831 ("This limitation (that only money damages are allowed for contract claims against the government) 'impliedly forbids' declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity."); *see, e.g.*, *Tucson*, 136 F.3d at 646; *N. Star Alaska v. United States*, 14 F.3d 36, 37–38 (9th Cir. 1994); *N. Side Lumber*, 753 F.2d at 1485; *Gengler v. U.S. ex rel. Dep't of Def. & Navy*, 453 F. Supp. 2d 1217, 1228 (E.D. Cal. 2006).[3] Consequently, if Plaintiffs' claims for declaratory

---

[3] The Federal Circuit has expressly declined to address whether it agrees with the Ninth Circuit that the Tucker Act impliedly precludes the APA's waiver of sovereign immunity, but noted that district courts may take guidance on the question from their regional circuits. *See Suburban*, 480 F.3d at 1128 (citing, among other cases, *N. Side Lumber*).

and injunctive relief relate to a contract with the government such that the Tucker Act applies, the Act precludes the APA's sovereign immunity waiver and this Court lacks jurisdiction.

Also relevant, the CDA includes a limited waiver of sovereign immunity for contract claims against the federal government filed in the Court of Federal Claims. *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370 (Fed. Cir. 2009). The CDA's grant of jurisdiction is narrower than the Tucker Act's. *Id.* at 1372. Where the Tucker Act covers constitutional, statutory, *and* contract claims against the government, the CDA applies only "to any express or implied contract . . . made by an executive agency for" procurement of property or services, other than real property. 41 U.S.C. § 7102(a). The CDA provides that "a contractor," defined as any party to a federal government contract other than the federal government, "may only file suit in the Court of Federal Claims." *Williams v. United States Dep't of Agric.*, No. 13-CV-00508-JST, 2013 WL 5567486, at *4 (N.D. Cal. Oct. 7, 2013) (quoting *Texas Health Choice, L.C. v. Off. of Pers. Mgmt.*, 400 F.3d 895, 899 (Fed. Cir. 2005)). As such, while the waivers of sovereign immunity under the Tucker Act and the CDA are not identical, *Winter*, 570 F.3d at 1372, both ultimately divest district courts of jurisdiction over claims concerning contracts with the government. Consequently, as with the Tucker Act, if the CDA applies, this Court lacks subject matter jurisdiction to hear the dispute because jurisdiction lies exclusively with the Court of Federal Claims.

The Court's jurisdiction turns on whether Plaintiffs' claims relate to a government contract subject to the Tucker Act's or the CDA's restrictions.

### B. Contract Disputes Act & Tucker Act

Defendants argue Plaintiffs' claims relate to the Data Rights Agreement and 2000 Contract, meaning the CDA governs and deprives this Court of jurisdiction. (*See* Mot. 8.) Defendants contend that Plaintiffs' frame their requested relief as falling under the APA in an attempt to "plead around the CDA to bring a claim relating to a contract before a district court." (*Id.* at 9.) Plaintiffs counter that their

claims do not relate to the 2000 Contract or the Data Rights Agreement, but, rather, "[t]he essence of Plaintiffs' claim is the violation of the Trade Secrets Act in unlawfully using and disseminating Plaintiffs' proprietary data." (Opp'n 9.) Plaintiffs insist that, even if their claims relate to the contracts, the CDA does not apply because Plaintiffs are not attempting to enforce either contract. (Opp'n 13–16.)

In the CDA, Congress enacted a comprehensive statutory scheme governing disputes regarding government contracts. *Winter*, 570 F.3d at 1369; *see Williams*, 2013 WL 5567486, at *3–4 (discussing the procedural prerequisites to a contractor filing suit in the Court of Federal Claims). "The intent behind [the CDA's] scheme is to confine these government contract disputes to expert tribunals created expressly for that purpose." *United States v. Suntip Co.*, 82 F.3d 1468, 1474 (9th Cir. 1996). "[C]entralizing the resolution of government contract disputes in the Court of Federal Claims . . . ensure[s] national uniformity in government contract law." *Williams*, 2013 WL 5567486, at *4 (quoting *Texas Health Choice*, 400 F.3d at 899). "That intent is defeated if a contracting party may, by filing a declaratory judgment action in district court, compel the government to litigate the merits of its contracting officers' decisions in district court." *Suntip*, 82 F.3d at 1474. Accordingly, where a government contract is involved, courts must look beyond a plaintiff's articulation to identify the essence of the claim. *See Suburban*, 480 F.3d at 1124 ("[W]e must look beyond the form of the pleadings to the substance of the claim."); *Texas Health Choice*, 400 F.3d at 900 (finding that plaintiff's articulation of relief "is of no consequence to the question of jurisdiction because the complaint relates to a dispute implicating a contract with the [g]overnment").

A claim is contractual in nature under the CDA where it "relates to" or has "some relationship to the terms or performance of a government contract." *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011) (discussing that "claim" and "related to" should be read broadly under the CDA). To determine whether a claim is "founded upon a contract for the purposes of the Tucker Act,"

courts consider "the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought (or appropriate)." *Gabriel*, 547 F. App'x at 831 (quoting *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Thus, where a plaintiff's claim is "concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently of the contract[,] the claim is founded upon a contract with the United States and is therefore within the Tucker Act and subject to its restrictions on relief." *N. Star Alaska*, 14 F.3d at 37 (internal quotation marks and alterations omitted). Similarly, where the relief a plaintiff seeks is a determination of contract rights, the claim is contractually-based for purposes of the Tucker Act and the district court lacks jurisdiction. *See Tucson*, 136 F.3d at 647 (finding claim contractually-based where plaintiff was "asking the district court to decide what its contract rights [were]").

Plaintiffs invoke the APA to seek declaratory and injunctive relief regarding the proprietary rights to use or disclose the MAFFS II systems data. (*See* Compl. ¶ 66; Opp'n 7–9.) But the MAFFS II systems data rights are expressly defined in the Data Rights Agreement, with explicit reference that they derive from the 2000 Contract. (DRA 2 (stating that ownership and use rights in the MAFFS II systems data are "set forth in [the 2000 Contract]"); Compl. ¶ 30.) And Plaintiffs do not dispute that the 2000 Contract is a government contract under the CDA, subject to the exclusive jurisdiction of the Court of Federal Claims. (Opp'n 13.) In essence, Plaintiffs seek a determination of rights under the contracts; thus, their claims relate to and are concerned solely with the rights articulated in Data Rights Agreement and the 2000 Contract.

Plaintiffs mention in passing that Aero Union developed the MAFFS II systems at "private expense," implying that the rights in dispute arose independently from the 2000 Contract. (Opp'n 14.) However, this implication is contradicted by Plaintiffs' allegations and the express terms of the Data Rights Agreement, which establish that the MAFFS II data in dispute was developed pursuant to the 2000 Contract.

The Data Rights Agreement provides that, in April 2000, the Forest Service and Aero Union entered into the 2000 Contract, pursuant to which Aero Union was to "design, develop, and fabricate a new prototype" MAFFS system. (DRA 1; Compl. ¶ 27.) At the termination of the contract in 2012, "[t]he MAFFS II data rights, patents and other intellectual property *developed under the program* were owned by Aero Union, subject to the [Forest Service's] use rights *derived from the contract*." (Compl. ¶ 27 (emphases added).) UAC subsequently acquired title to Aero Union's MAFFS II data rights through the foreclosure sale, and obtained the portable hard drive with its MAFFS data that UAC later agreed to deliver to the Forest Service for "good and valuable consideration." (DRA 1; Compl. ¶ 31.) In the Data Rights Agreement, UAC and the Forest Service each expressly agreed,

> *[A]s set forth in [the 2000 Contract]*, the technical data produced or specifically used or related to the [MAFFS II systems] *developed pursuant to such contract* shall remain the property of UAC . . . and [the Forest Service] shall have unlimited rights to view and use the data required for the continued operation and maintenance of the [MAFFS] product.

(DRA 2 (emphases added).) Plaintiffs allege that the Forest Service conveyed the hard drive with the MAFFS II data to Defendants, which data Defendants are now using unlawfully. (Compl. ¶¶ 32–33.) Plaintiffs ask the Court to determine the parties' rights to use or disclose the MAFFS II data that UAC conveyed via the hard drive pursuant to the Data Rights Agreement. (*See* Compl. ¶¶ 53–66.) However, if the only data Defendants possess derives from the hard drive UAC delivered to the Forest Service pursuant to the Data Rights Agreement, then the only data Defendants may be using or disclosing is the data developed pursuant to the 2000 Contract. As a result, Plaintiffs claims are concerned solely with rights created within the contractual relationship and not independent obligations, and the claims are therefore contractually based.

Plaintiffs' reliance on *Megapulse, Inc. v. Lewis* is unavailing. (*See* Opp'n 2, 10–12.) In *Megapulse*, the D.C. Circuit found the district court had jurisdiction over a plaintiff's APA claims seeking to prevent government disclosure of plaintiff's proprietary data. 672 F.2d at 971. There, the plaintiff delivered independently developed proprietary data related to his design of a long-range transmitter to the federal government pursuant to a contract. *See id.* at 962. When the government subsequently sought to disclose the data, the plaintiff sought an injunction in district court under the APA, alleging a violation of the Trade Secrets Act. *Id.* at 963. The court in *Megapulse* recognized "the possible conflict between jurisdiction over APA-based claims and the restricted role of the federal courts in contract actions under the Tucker Act," and "reemphasize[d] . . . that an action against the United States which is at its essence a contract claim lies within the Tucker Act and that a district court has no power to grant injunctive relief in such a case." *Id.* at 966–67.

Nevertheless, the court in *Megapulse* found the plaintiff's claim was not "'at its essence' a contract claim" because the plaintiff sought to protect proprietary data developed *before* it contracted with the government and prevent disclosure of only six specific pages of data reflecting plaintiff's prior-developed intellectual property. *Id.* at 966, 969. Thus, the source of rights underlying the claim arose independently from any contract, so the plaintiff's claim was not contractually-based within the Tucker Act. *Id.* at 971; *see also Dowty Decoto, Inc. v. Dep't of Navy*, 883 F.2d 774, 779–80 (9th Cir. 1989) (finding plaintiff's APA claim to prevent disclosure of proprietary rights was not contractually based because the plaintiff had developed a workable design with patents in place before contracting with the government, and the contract was for parts procurement, not research and development).

Here, in contrast, Plaintiffs' allegations and the Data Rights Agreement establish that the MAFFS II system was "design[ed], develop[ed], and fabricate[d]" pursuant to the 2000 Contract with the federal government over many years. (Compl. ¶¶ 27–28.) Unlike *Megapulse*, the allegations here do not support that the MAFFS II

data conveyed on the hard drive was developed prior to or independently from the 2000 Contract. Further, where the plaintiff in *Megapulse* sought to prevent disclosure of six specific documents reflecting preexisting proprietary data, Plaintiffs here seek to prevent disclosure of *all data related to the MAFFS II system*; they do not identify or otherwise distinguish any prior-developed data from that developed pursuant to the 2000 Contract. Thus, the disputed rights here do not arise independently from, but rather relate entirely to, the government contracts and thus are contractually based.

In consideration of Congress's restriction on district courts' jurisdiction with respect to federal government contracts and the purpose behind the Acts to centralize such claims in the Court of Federal Claims, and in light of Plaintiffs' well-pleaded allegations and the express language of the Data Rights Agreement establishing that the MAFFS II data were developed pursuant to the 2000 Contract, the Court finds Plaintiffs' claims for declaratory and injunctive relief under the APA relate to a government contract. Consequently, the Tucker Act applies and precludes the APA § 702 waiver of sovereign immunity. *See Gabriel*, 547 F. App'x at 830 (citing *Tucson*, 136 F.3d at 645). Therefore, regardless of whether the contracts at issue come under the narrower limitations of the CDA, this Court lacks subject matter jurisdiction and must dismiss.[4]

### C. Leave to Amend

Where a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025,

---

[4] Plaintiffs also assert 28 U.S.C. § 1491(b)(1) as a basis for jurisdiction over their claims that Defendants violated or will violate federal procurement law. (Compl. ¶¶ 9, 58.) Although Plaintiffs fail to raise section 1491(b)(1) in opposition to Defendants' Motion, such an argument would nevertheless fail as jurisdiction under § 1491(b)(1) is also vested exclusively with the Court of Federal Claims. *See Gonzalez-McCaulley Inv. Grp. Inc. v. U.S. Dep't of Veteran Affs.*, No. CV-13-06877-BRO (JEMx), 2014 WL 12610145, at *3, 4 (C.D. Cal. Feb. 10, 2014) (discussing that Congress ended district courts' jurisdiction and granted exclusive jurisdiction over § 1491(b)(1) claims to the Court of Federal Claims; "[T]he jurisdiction granted to the Court of Federal Claims under § 1491(b)(1) is expansive.").

1031 (9th Cir. 2008). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Thus, leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City and Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

Here, dismissal is necessary because the Court lacks subject matter jurisdiction. However, it is possible Plaintiffs can allege facts showing that the MAFFS II proprietary data was developed privately, outside of the government contracts. Thus, the Court does not find that amendment would be futile and, accordingly, leave to amend is appropriate.

## V.     CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion to Dismiss **with leave to amend**. (ECF No. 13.) Plaintiffs may file a First Amended Complaint addressing the identified deficiencies within **fourteen days** of the date of this Order. If Plaintiffs timely file an amended complaint, Defendants must file their response in accordance with Rule 15(a)(3). Failure by Plaintiffs to timely amend will result in the dismissal and closing of this case.

**IT IS SO ORDERED.**

March 2, 2021

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE